In re Anonymous No. 133 D.B. 97

Disciplinary Board Docket no. 133 D.B. 97.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

DONOHUE, *Member,* December 1, 1998—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

This matter was initiated by a petition for discipline filed on November 6, 1997 by Office of Disciplinary Counsel against respondent, [   ]. The petition alleges that respondent violated Rules of Professional Conduct in his representation of two clients. Respondent did not file an answer to the petition.

By notice dated January 29, 1998, a disciplinary hearing was set for February 24, 1998, a copy of which notice was personally served on respondent on February 9, 1998. The hearing was held as scheduled on February 24, 1998 before Hearing Committee [   ] comprised of Chair [   ], Esquire, and Members [   ], Esquire, and [   ], Esquire. Respondent did not appear for the hearing.

The committee filed a report on June 16, 1998 and recommended disbarment. No briefs on exceptions were filed by the parties.

This matter was adjudicated by the board at the meeting of August 13, 1998.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was born on January 24, 1954, was admitted to practice law in the Commonwealth on May 2, 1984, maintains his office at [    ], and is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

(3) On February 5, 1998, petitioner filed with the Disciplinary Board a petition for issuance of a rule to show cause why respondent should not be suspended for failure to comply with a subpoena pursuant to Pa.R.D.E. 208(f)(5), alleging that respondent failed to comply with a subpoena served in a matter unrelated to the instant matter.

(4) On February 5, 1998, the Disciplinary Board chair issued an order and rule to show cause requiring respondent to show cause why he should not be suspended for failure to comply with the subpoena.

(5) The petition and order and rule to show cause were personally served upon respondent.

(6) Respondent did not respond to the order and rule to show cause.

(7) On March 18, 1998, petitioner filed a petition to make rule absolute and temporarily suspend respondent for failure to comply with a subpoena pursuant to Pa.R.D.E. 208(f)(5).

(8) The Disciplinary Board certified the matter to the Supreme Court, and on April 20, 1998, the Supreme Court entered an order placing respondent on temporary suspension pursuant to Pa.R.D.E. 208(f).

(9) In addition to his law practice, respondent was a partner in an automobile racing business named [A].

(10) In December 1992, respondent was retained as the corporate attorney for [B] by [C], president of [B]. Respondent incorporated the business in January 1993.

(11) In early February 1994, respondent represented [B] in attempting to recover from a client who had defaulted on a loan. Respondent advised [C] that he was unaware that [B] could provide funding to clients and asked if [C] could help him obtain short-term funding for $50,000 to keep his racing team running until he could obtain funds from a sponsor.

(12) [C] advised respondent that [B] could only finance payroll clients by advancing payroll, subject to approval from his funding source. [C] agreed to take respondent on as a payroll client.

(13) [C] wrote a memorandum to the finance company assuring them that respondent could be trusted because he was [B's] corporate attorney. The funding company approved the advance on the condition that respondent would

guarantee that the money would be returned within 10 days.

(14) On February 9 and 11, 1994, respondent signed client service agreements and warranty and guarantee forms with [B] for the provision of payroll services to his automobile business and his law firm.

(15) Respondent did not disclose the ethical implications of his arrangement to [C] in writing or advise [C] to seek the advice of independent counsel, and [C] did not consent in writing after such disclosure.

(a) Respondent failed to explain to [C] what he would need to do to assure respondent's personal liability on the loans, in spite of the fact that respondent relied on his personal assets to secure the loan.

(b) Respondent later asserted his lack of personal liability as a defense, taking advantage of the failure of the agreements to assure this security.

(16) [B] delivered a check for $50,000 to respondent on February 9, 1994, and subsequently delivered payrolls to respondent's law firm and racing business on February 14, 15, and 25, and March 15, 1994. In all, between the initial disbursement and payroll checks delivered to respondent and his employees, taxes and fees, respondent incurred liability of $122,450.52 to [B] between February 9 and March 15, 1994.

(17) On March 10, 1994, respondent wrote check no. 316 payable to [B] in the amount of $64,047.41 drawn on [A] , account no. [    ], at [D] Bank.

(a) [B] deposited this check in its bank and promptly wire-transferred these funds to its lender, which would

not advance any further payroll until respondent's account was current.

(b) Check no. 316 was returned on March 21, 1994 for insufficient funds. As a result of this check, [B] had to cover checks written on behalf of other clients, and sustained losses due to interest charges, penalties and adverse perception on the part of other clients.

(18) In order to forestall bad checks as a result of check no. 316, respondent wrote check no. 112 postdated April 8, 1994 payable to [B] in the amount of $35,000 drawn on his [A] account. Respondent told [C] that funds would be available on the date of the check to cover it. In reliance on this check, [B] wired the funds to the IRS for payment of payroll taxes.

(a) On April 12, 1994, a stop payment order was placed on check no. 112.

(b) On April 15, 1994, check no. 112 was returned as drawn on uncollected funds.

(19) On April 21, 1994, [B] filed a complaint in a civil action against respondent, his partner [E] and [A], seeking damages in the amount of $122,449.52. This action was docketed in the Court of Common Pleas of [   ] County at no. [   ].

(20) [B] also terminated its client-attorney relationship with respondent dated May 13, 1994.

(21) In negotiations with [B's] counsel, respondent agreed to pay [B] the sum of $84,949.53 in settlement. On or about May 27, 1994, respondent wrote check no. 1090 (postdated May 31, 1994) on his attorney at law

account at [F] bank, payable to [B] in the amount of $84,949.53.

(22) [B's] bank refused to accept respondent's check for deposit because there were not sufficient funds in his account to cover the check.

(23) In all, respondent received benefit of $122,450.52 from [B], of which nearly $100,000 was paid directly to respondent and his staff. He subsequently paid [B] $50,000. The total of bad checks respondent wrote to [B] was $183,996.64.

(24) [B] filed a claim with the Pennsylvania Lawyers Fund for Client Security, which claim was paid in the amount of $50,000. Respondent has not reimbursed the fund.

(25) Beginning in 1991, respondent represented a dry cleaning business of which [G] was the president. Respondent subsequently advised [G] in a financial settlement relating to a divorce.

(26) [G] requested that respondent let him know if he became aware of any other business opportunities that might become available. Due to their client-attorney relationship, respondent knew how much money [G] had to invest and what kind of business opportunities would interest him.

(27) In June 1993, respondent met with [G] and informed him of a limousine business that another client of respondent, [H], had for sale.

(28) In a meeting on June 10, 1993, respondent and [G] agreed to purchase the business as partners.

(a) [G's] understanding was that he would put up the original capital and run the business. Respondent was to perform all legal work and would pay [G's] living expenses for the first few months until the business was profitable. Respondent did not give [G] a written partnership agreement, counsel him as to the risks involved in the transaction, advise him to seek the advice of independent counsel, or obtain a written consent to the representation.

(b) [G] believed respondent was still serving as his attorney, particularly since he understood that respondent was to perform legal services for the limousine business as part of his contribution to the enterprise.

(29) On June 10, 1993, [G] delivered two checks in the amount of $35,000 to respondent, who wrote up a handwritten receipt which set forth terms for refund of [G's] money if the purchase could not be completed by August 15, 1993.

(30) A contract with [H] was executed on September 2, 1993. By this agreement [H] was to transfer all assets of his company including its only vehicle, registration and PUC license, to respondent and [G's] new concern. [G] signed the agreement but did not receive a copy of the signed contract.

(31) It was legally necessary for the business to have a PUC license to operate. Respondent advised [G] that he could operate the business while respondent arranged for transfer of the PUC license, and [G] relied upon respondent's legal expertise in this regard.

(32) [G] began operating the business and was paid by respondent pursuant to their oral agreement. [G] also had access to the proceeds of the business.

(33) In November 1993, the partnership purchased [I] Limousine Company, thereby acquiring two additional vehicles. Respondent paid the $5,000 down payment and [G] agreed to make monthly payments in the amount of $854.62 out of the proceeds of the business. [G] understood that respondent would handle the task of transferring the PUC license.

(34) Between September 1993 and February 1994, [G] repeatedly checked with respondent, who confirmed that the license transfers had not occurred. Respondent assured [G] he would take care of the transfers.

(35) In March 1994, [G] received a telephone call from an officer of the Public Utility Commission, questioning whether he was licensed to run a limousine business. [G] referred this call to respondent.

(36) While [G] was present in his office, respondent spoke on the telephone to the PUC, and stated that [H] still owned the limousine service, and [G] was [H's] manager.

(a) This was the first indication [G] had that he and respondent did not own the limousine service.

(b) Respondent subsequently told [G] that [H] had an undisclosed partner who refused to sign the sales agreement, and thus respondent had not been able to transfer the license.

(37) On May 26, 1994, [G] received a cease and desist letter from the PUC. He contacted respondent, and re-

spondent advised [G] to shut down the business, which he did on June 4, 1994. [G] returned the limousines purchased from [I] Limousine to the seller, as he lacked income to make ongoing payments.

(38) In the weeks subsequent to the business shutdown, respondent and [G] discussed the possibility of respondent buying out [G's] interest as contemplated in the agreement of June 10, 1993. However, no repurchase occurred and [G] lost his entire $35,000 investment in the business.

(39) Respondent has no prior history of discipline.

## III. CONCLUSIONS OF LAW

By his conduct in the [B] matter, respondent violated the following Rules of Professional Conduct:

(1) R.P.C. 1.8(a)—A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to the client unless:

(a) The transaction and the terms on which the lawyer acquires the interest are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(b) The client is advised and is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(c) The client consents in writing thereto.

(2) R.P.C. 8.4(b)—It is professional misconduct for a lawyer to commit a criminal act that reflects adversely

on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

(3) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

By his conduct in the [G] matter, respondent violated the following Rules of Professional Conduct:

(1) R.P.C. 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client;

(2) R.P.C. 1.4(b)—A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation;

(3) R.P.C. 1.8(a)—A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to the client unless:

(a) The transaction and the terms on which the lawyer acquires the interest are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client.

(b) The client is advised and is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(c) The client consents in writing thereto.

## IV. DISCUSSION

This matter is before the board on a petition for discipline filed against respondent based upon charges of violations of the Rules of Professional Conduct involving

two separate clients. Respondent failed to file an answer to the petition, nor did he appear at the disciplinary hearing. He did not file a reply brief in response to petitioner's brief to the committee, and he never contacted petitioner regarding the proceedings against him. During the pendency of the instant proceedings, respondent was temporarily suspended by order of the Supreme Court dated April 20, 1998 for failing to comply with a subpoena served in a matter unrelated to this case.

The two charges against respondent are factually similar. In both cases, respondent entered into a business transaction with a client without explaining the risks involved or advising the client to consult independent counsel. In both cases, respondent defaulted on his obligations under the arrangement and caused prejudice and financial loss to the client.

In the [B] matter, respondent entered into a complex business transaction with [B], for whom he served as corporate counsel. Rule 1.8(a) required that respondent advise [C], [B's] principal, of the potential conflicts created by respondent's roles as corporate attorney, customer and borrower and allow [C] to seek independent counsel or obtain a written waiver of the possible conflicts. Respondent did not so advise [C] at the time of the transaction. This failure was prejudicial to [C] and [B]. Respondent did not advise [B], through [C], of how to secure his own personal liability in the transaction between respondent and [C] on behalf of [B]. Respondent subsequently defaulted on the loan and [B] was forced to file

suit against respondent to get the money. Respondent then relied on the lapse in the agreement covering personal liability to defend himself against the suit. This is a clear conflict of interest and exactly the type of situation the requirements of Rule 1.8(a) are designed to avert.

Respondent compounded his problems in the [B] matter by writing three checks on insufficient funds to [B] in the aggregate amount of $183,996.64. The first check was written in the amount of $64,047.41 with respondent's full knowledge that it would not be covered. In the deposition of respondent taken in the suit filed by [B], which was made part of this record, respondent testified that he knew it would not be covered and it was only written so [C] would have a copy to fax his lender, but respondent never intended for it to be deposited. (Exhibit 29.) This is not a credible explanation, and even if it were true, it would be an admission to respondent's participation in loan fraud. Writing a bad check with knowledge that it will not be honored is a violation of 18 Pa.C.S. §4105. Although respondent was not criminally convicted, his action in writing that check violates R.P.C. 8.4(b), as he committed a criminal act reflecting adversely on his honesty and trustworthiness as a lawyer.

The other two checks respondent wrote were postdated. There is no clear authority that postdated checks can support a charge under 18 Pa.C.S. §4105, and therefore there is no clear and convincing evidence that these latter checks violate R.P.C. 8.4(b). These checks do represent part of a pattern of dishonesty and deceit engaged in by

respondent, and a violation of R.P.C. 8.4(c) is established by this behavior.

In the [G] matter, respondent undertook to represent [G] in the acquisition of a legally licensed limousine business. Respondent informed [G] of the availability of the business and became a partner in it with an expectation of receiving 50 percent of the profits. [G] entrusted $35,000 to respondent for the purchase of the business. [G] was responsible for running the business operations and respondent was responsible for any legal work necessary to transfer valid ownership and licensing to enable the business to function.

Respondent failed from the beginning to comply with his responsibilities to counsel [G] as to the terms of the business. It is clear that [G] regarded respondent as his attorney, in addition to a business partner, as respondent represented him in a variety of business and personal matters before, during and after the limousine business started. Respondent never provided [G] with a partnership agreement setting forth each partner's duties, and respondent never advised [G] of potential problems associated with his role as attorney and business partner. The only arrangement reduced to writing was a handwritten receipt providing that [G's] money would be refunded if the sale of the business was not completed by August 15, 1993. Respondent's actions violated Rule 1.8(a).

Respondent's duties to the business included transferring the title and the Public Utility Commission license

necessary for operation. Respondent did not do these things and failed to inform [G] of the situation. [G] believed he owned the business, when in fact proper title had never been transferred. [G] was subsequently forced to shut down the business and return the limousines. [G] was unable to get his money back from respondent and lost his $35,000 investment. Respondent's misconduct violated R.P.C. 1.3 and 1.4(b).

The most serious misconduct is relative to respondent's involvement in business transactions with clients without advising the clients of possible complications arising therefrom. Respondent placed his financial interests above the interests of his clients. This resulted in severe prejudice to his clients. Respondent completely ignored his fiduciary responsibilities to his clients.

Prior cases have addressed this type of misconduct. The lawyer in *In re Anonymous No. 10 D.B. 85 and 1 D.B. 86,* 47 D.&C.3d 361 (1987), was the solicitor for a bank. The lawyer and his wife borrowed $30,000 from the bank for a family real estate transfer. The bank delivered the papers and disbursement check to the lawyer, who was acting as his own attorney in the matter. The testimony established that the bank was relying on the lawyer's trustworthiness as an attorney rather than as a borrower. The lawyer never obtained record title or recorded the bank's mortgage. He later defaulted on the payments, causing financial loss to the bank, which had no security in the premises. This attorney also committed lesser misconduct in two other counts and was serv-

ing a one year suspension for failing to file income tax returns. The board recommended a three year suspension, but the Supreme Court disbarred the attorney.

*In re Anonymous No. 16 D.B. 87,* 8 D.&C.4th 493 (1990), arose from the conviction of a lawyer who was the administrator of a pension fund for concealing his financial interest in properties for which the pension fund provided mortgages. The board found that the attorney was involved in a failing business venture and used his position of trust to arrange loans through his business partner resulting in personal profit to him in that it relieved him of personal liabilities. The board recommended a five year suspension, but the court imposed a three year suspension.

The instant matter is aggravated by several facts. Respondent did not make restitution to or comply with his contractual obligations to either [B] or [G]. In the [B] case, respondent benefited in the amount of approximately $50,000 to $75,000. The Lawyers Fund for Client Security made an award of $50,000 to the client, but respondent never reimbursed the fund. It is unclear what happened to [G's] $35,000. Failure to make restitution or take other remedial steps is an aggravating factor in cases where the attorney's misconduct has resulted in loss to the client. *In re Anonymous No. 31 D.B. 90 and 107 D.B. 91*, 20 D.&C.4th 368 (1994).

Respondent failed to appear and defend his conduct in the disciplinary proceeding. This demonstrates respondent's lack of regard for the disciplinary system and his lack of concern for his misconduct. Such a failure to

appear has been treated as an aggravating factor. *In re Anonymous No. 3 D.B. 93,* 25 D.&C.4th 258 (1995).

After considering the seriousness of respondent's misconduct, coupled with the aggravating factors discussed above, the board recommends that respondent be disbarred, retroactive to April 20, 1998.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, [   ], be disbarred, retroactive to April 20, 1998, the date your court placed respondent on temporary suspension at no. 12 D.B. 98.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

## ORDER

And now, April 19, 1999, the order entered by this court on January 26, 1999, is hereby vacated and, upon consideration of the report and recommendations of the Disciplinary Board dated December 1, 1998, it is hereby ordered that [respondent] be and he is disbarred from the bar of this Commonwealth retroactive to April 20, 1998, the date this court imposed the temporary suspension at no. 12 D.B. 98, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.